Case 1:22-cv-02426-LLS Document 99 Filed 05/04/22 Page 1 of 19

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/4/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JET EXPERTS, LLC,

                Plaintiff,

    - against -

ASIAN PACIFIC AVIATION LIMITED and
TVPX AIRCRAFT SOLUTIONS, INC., IN ITS
CAPACITY AS OWNER TRUSTEE,

                Defendants.

22 Civ. 02426 (LLS)

OPINION & ORDER

There are very few disputes about facts in this tale of the purchase of a specialized aircraft that nearly came to an end because of greed and broken promises but was saved and will be performed. What the parties did is open and undenied; the disputes are about how those facts should be understood, and the consequences.

**SUMMARY**

Plaintiff Jet Experts is a foreign limited liability company involved in the business of corporate jet charter acquisition. Dr. Gillis, the principal of Jet Experts, uses the aircraft he acquires for Jet Experts to perform organ transplant transportation services.

In April of 2021, Dr. Gillis contracted with defendants to buy a 2012 Bombardier Challenger 300 Aircraft (the "Aircraft"). The Aircraft was not new, and was somewhat dilapidated. But in the belief, based on a contract and promises by defendants, that his replacements and alterations, including two engines, would

-1-

yield him a single superior product tailored to his professional needs when the purchase closed, he poured time, money and effort into its renovation particularly adapted to his practice.

On the brink of closure and transfer to plaintiff of the completed aircraft, the defendant sellers suddenly announced that the contract was terminated. They had found a higher bidder, to whom they could sell the aircraft at a substantially higher price. See Ling Dep. 39:2-24; Ling Ex. 4.

## DISCUSSION

The defendant sellers say that unilateral termination is allowed by a subparagraph in the contract (Aircraft Purchase Agreement, "APA"). They claim that Section 7.5.1 of the APA protects them from any remedy calling for specific performance, and in any event limits plaintiff's damages from the obliteration of the contract to $100,000. But that provision does not apply.

<u>CONTRACT PROVISIONS</u>

Sections 7.5.1 and 7.5.2 provide:

7.5   Default.

7.5.1 Seller's Default. Unless otherwise provided herein, this Agreement may be terminated by Purchaser in the event of a breach by Seller of any material obligation under this Agreement which breach is not cured within ten (10) Business Days of the delivery to Seller of written notice there of from Purchaser or which breach by its nature cannot be cured prior to Closing. If Purchaser elects to terminate this Agreement under this Section 7.5.1, (i) the entire Deposit (including the applicable Reimbursable Flight Costs Deposit) shall be immediately refunded to Purchaser, (ii) Seller shall reimburse Purchaser upon Purchaser's demand for the actual costs of the Purchaser's Inspection paid or payable by Purchaser to the Inspection Facility, (iii) Seller shall reimburse Purchaser

-2-

any documented out of pocket costs (including, without limitation, legal fees) expended or payable by Purchaser in connection with the transactions contemplated hereby, (iv) Seller shall bear the Flight Costs for all, as applicable, of the Positioning Flight, the Test Flight, and the Return Flight, and (v) this Agreement shall be of no further force or effect. The aggregate amount of all such reimbursement and costs mentioned in Section 7.5.1(ii) and 7.5.1(iii) shall be limited to One Hundred Thousand and No/100 United States Dollars (US$100,000.00). Purchaser acknowledges and represents that the above-referenced damages and reimbursements are a reasonable estimate of the damages that would be incurred by Purchaser in the event Seller defaults on Seller's obligations under this Agreement. Purchaser's rights to receive the above-referenced amounts shall be the sole remedies available to Purchaser in the event Seller defaults on Seller's obligations under this Agreement, and Purchaser waives any other remedies that may be available to Purchaser at law or in equity.

7.5.2 Purchaser's Default.  Unless otherwise provided herein, this Agreement may be terminated by Seller in the event of a breach by Purchaser of any material obligation under this Agreement which breach is not cured within ten (10) Business Days of the delivery to Purchaser of written notice thereof from Seller or which breach by its nature cannot be cured prior to Closing. If Seller elects to terminate this Agreement under this Section 7.5.2, (i) Escrow Agent shall pay the Deposit to Seller as liquidated damages and distribute to Seller the Reimbursable Flight Costs for the Positioning Flight and Test Flight (if applicable), which has been pre-paid by Purchaser (for the avoidance of doubt, any insufficient amount of such pre-paid Reimbursable Flight Costs shall be paid by Purchaser to Seller directly, and any excess amount of such pre-paid Reimbursable Flight Costs shall be refunded to Purchaser by Escrow Agent), (ii) Purchaser shall pay to Seller the Reimbursable Flight Costs for Return Flight, (iii) Purchaser shall pay to the Inspection Facility any unpaid costs of the Purchaser's Inspection, and (iv) this Agreement shall be of no further force or effect. Seller acknowledges and represents that the liquidated damages amount provided for in this Section 7.5.2 is a reasonable estimate of the damages that would be incurred by Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement. Seller's right to receive the Deposit as liquidated damages and Reimbursable Flight Costs and to require Purchaser to make payment to the Inspection Facility for any unpaid Inspection costs under this Section 7.5.2 shall be the sole remedies available to Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement, and Seller waives any other remedies that may be available to Seller at law or in equity.

Sections 7.5.1 and 7.5.2 provide for termination of the contract, but each of them rests upon a predicate: the other party has defaulted. It is that default that creates in the non-defaulter the power to terminate the contract on the terms set forth in the section.

In this case there is no default by the buyer, and the terms set forth in Section 7.5.2 are not available to the seller.

This seller, without provocation, simply declared the whole contract was terminated, including those inapplicable sections. They are inapplicable because there is no predicate default by the buyer. The condition precedent to their taking effect has not been satisfied. Thus, those sections are not effective for the benefit of the seller, who in any event rejected the whole contract containing them.

Even if one were to characterize seller's attempted unilateral termination as merely a breach under the Agreement, the $100,000 limitation in Section 7.5.1 still does not apply.

Defendants, citing Deutsche Lufthansa AG, v. The Boeing Co., 2006 WL 3155273 (S.D.N.Y. 2006), argue that the unambiguous intent of Section 7.5.1 is to limit to $100,000 the remedy available to Jet Experts if Asian Pacific fails to perform, regardless of whether plaintiff elects to overlook defendants' default and seeks to enforce the contract.

In that case, Judge Sand enforced the limitation in a

-4-

similar liquidated damages provision where requiring performance would have required Boeing, for the benefit of one customer, to maintain a service employing 300 people which Boeing had chosen to shut down. Deutsche Lufthansa, 2006 WL 3155273 at *2, 5-6. While the contract terms were similar, the facts of that case are so strikingly different from the facts of this one that it is not surprising they have different outcomes.

Here, the Agreement must be interpreted so as to give effect to the intention of the parties as expressed in the language of the contract. See American Commer. Lines LLC v. Water Quality Ins. Syndicate, 679 F. Appx. 11, 14 (2d Cir. 2017). The clear and plain meaning of Section 7.5.1 is that Purchaser (plaintiff) agreed to limit its monetary remedies to those delineated in Section 7.5.1 "[i]f Purchaser elects to terminate th[e] Agreement under Section 7.5.1." JX 1 at § 7.5.1. The limitation of damages language at the end of the paragraph in Section 7.5.1 explicitly refers back to the preceding damages calculation tied to that conditional language ("the above referenced damages" and "the above referenced amounts"). Because plaintiff has not elected to terminate the Purchase Agreement, the succeeding limitations provision has no application here.

In any event, if those provisions were to be applied here in the manner suggested by defendants, they are void as against public policy. They would serve as an instrument of fraud, allowing a seller to encourage the buyer to increase the

investment value of an agreed purchase at that buyer's cost in reliance on a contract of sale with accompanying representations, only to terminate at the point of delivery to sell the thus enhanced- valued product to a higher bidder. Such programmed deceptions (a form of "bait and switch") are against public policy, and the contract will not be interpreted to create such a result.

This case is to be regarded as a simple unjustifiable termination of contract subject to the normal remedies provided by law. Among those is the ordering of specific performance of the contract, which is particularly appropriate in the sale of unique assets, such as this Aircraft.

**REMEDY**

That brings us to defendants' second line of defense: the propriety of ordering performance of the contract as the remedy for its attempted termination.

The law has been slow to order specific performance of a disowned contract in cases where the performance consisted in turning over an article which is mass-produced. This reluctance is analogous to the denial of an injunction when the injury can equally well be remedied by money damages. So the "specific performance" directive is mainly imposed when there is no satisfactory, easier remediation, at hand, such as the delivery of an equivalent article or payment of money.

Dr. Gillis does not need money. He needs the best available

aircraft for his special medical purposes, and the one he bought it better than any other.

New York's Uniform Commercial Code ("UCC") § 1-102, et seq. governs this case because the Purchase Agreement involves a "transaction in goods." UCC §§ 2-102 (codifying that Article 2 of the UCC applies to "transactions in goods"); 2-105 (1) ("goods" includes "all things ... which are movable."); see also Aviation Dev. Co. PLC v. C&S Acquisition Corp., No. 97 Civ. 9302 AJP, 1999 WL 46630, *11 (S.D.N.Y. Feb. 2, 1999) (a contract to purchase aircraft "is a contract for the sale of goods, covered by Article 2 of the New York Uniform Commercial Code"); Coastal Aviation, Inc., v. Commander Aircraft Co., 937 F. Supp. 1051, 1062-63 (S.D.N.Y. 1996)(applying New York UCC provisions to contract for sale of airplanes).

The UCC "seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." UCC § 2-716, Official Comment 1. Section 2-716 governing a "Buyer's Right to Specific Performance or Replevin" provides:

> (1) Specific performance may be decreed where the goods are unique or in other proper circumstances.
> (2) The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.
>
> * * * *

As stated in UCC § 2-716, Comment 2,

> In view of this Article's emphasis on the commercial feasibility of replacement, a new concept of what are "unique"

goods is introduced under this section. Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract. . . . However, uniqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and inability to cover is strong evidence of "other proper circumstances".

Based on the testimony provided by Dr. Gillis and Mr. Zuskin,[1] there is no available aircraft that serves Dr. Gillis's professional needs as well as the Aircraft at issue in this case, and other proper circumstances warrant the direction of specific performance.

The Aircraft is specifically identified in the Agreement as a 2012 Bombardier Challenger 300. See JX 1 at 2. The Challenger 300 started a new class of super-midsize aircraft. 4/8/2022 Hearing Tr. at 42:19-20. It is a newer aircraft, meaning it has a high percentage dispatch reliability (defined by the FAA as "the percentage of flights that departed as scheduled without delays or cancellations"). 4/12/2022 Hearing Tr. at 176:14-23. Challenger 300s are also faster than most other jets and have a long range, allowing for the fast transportation of organs from anywhere in the United States. 4/8/2022 Hearing Tr. at 42:17-44:1. The Challenger 300 also needs fewer total feet to take off and land than other mid-sized aircraft or super-mid-sized

---

[1] Mr. Zuskin is an experienced corporate aircraft appraiser who testified on behalf of defendants on the issue of uniqueness and on the current market for comparable aircraft. Defendants, after the hearings on the merits closed, also submitted a declaration from a Mr. Ming Liu, a maintenance engineer from BAA Jet Management, the aircraft management company that managed the Aircraft at issue. Mr. Liu's statements are largely conclusory and duplicative of Mr. Zuskin's testimony and do not cast doubt on Dr. Gillis's testimony.

aircraft, so it can land at more airfields or landing strips than other planes in its class. 4/8/2022 Hearing Tr. at 44:12-16; 4/12/2022 Hearing Tr. at 174:23-24, 175:7-15. The Challenger 300 can land at close to "90 percent of all the airports in the United States" (including the smaller airports within 15 to 20 minutes driving distance to Cedars-Sinai or UCLA hospitals, where Dr. Gillis performs surgical transplants). 4/12/2022 Hearing Tr. at 175:7-15, 176:9-13. The Challenger 300 is the only mid-size stand-up cabin aircraft that allows for the ability to fill every passenger seat, fill the fuel tanks, and still achieve its maximum range of 3,100 nautical miles (this is referred to as an aircraft's operating parameters). 4/8/2022 Hearing Tr. at 43:20-44:1; 4/11/2022 Hearing Tr. at 145:22-146:3. Challenger 300s also have flat floors, which makes it easy to bring patients on stretchers on board. 4/8/2022 Hearing Tr. at 42:17-43:1.

This particular Challenger 300 has less than 1,300 flight hours (in comparison to an average flight time of 3,500 flight hours). JX 1 at Exhibit A: Specifications; 4/12/2022 Hearing Tr. at 263:1-6. The engines have been overhauled (discussed *infra*) so they are now at "zero time", versus the overall total time on the Aircraft of 1,300 hours.[2] 4/8/2022 Hearing Tr. at 56:1-11;

---

[2] Mr. Zuskin questioned whether the Aircraft's engines could really be "zero time" engines, stating "in order for that airplane to be a zero-time airplane -- engine, every element in the engine would have to be replaced, and I have never seen that before on a 1300-hour engine, ever." 4/12/2022 Hearing Tr. at 230:1-15; 256:3-5. While the Court does not question the truth of Mr. Zuskin's statement that he has "never seen" that before, Mr. Zuskin never

-9-

61:4-10; 4/11/2022 Hearing Tr. at 126:8-16. This Aircraft has a cabin door that reduces noise and provides passengers with privacy. 4/11/2022 Hearing Tr. at 123:3-10. The Aircraft has a flight data recorder and a Smart Parts plan. 4/12/2022 Hearing Tr. at 203:16-21. It also has a three-piece divan (a type of sofa), which can be used to transport live human donors and can be converted into a medical stretcher. 4/11/2022 Hearing Tr. at 119:9-16; 4/12/2022 Hearing Tr. at 181:8-15.

The evidence as a whole shows that the Aircraft is unique in its characteristics (low flight hours, overhauled engines, three-piece divan, already inspected APU, completion of all required inspections, including its 96-month inspection) and its ability to serve plaintiff's unique purpose of organ transportation and ambulatory patient transport (flat floor, long range, fast speed, superior field performance, maximal operating parameters).

Other circumstances also warrant specific performance in this case. Plaintiff initially anticipated the Closing to occur in May or June of 2021. 4/8/2022 Hearing Tr. at 66:19-24.

---

personally inspected the Aircraft at issue (id. 270:2-3, "I have no technical knowledge of the airplane other than what I saw on JETNET"), never reviewed its maintenance logbooks (id. at 255:22-24, 256:21-257:2), and was unaware of the extensive repairs that had been arranged by Dr. Gillis regarding the engines, having not been present for the first two days of hearings and having not read Dr. Gillis's testimony. Id. 269:3-8. While Mr. Zuskin ultimately disagreed that, assuming the engines were zero-time after overhaul engines, that characteristic would be a valuable feature (id. at 263:18-264:24), he did not dispute that it would be unique.

The Court concludes that the engines are "zero time", in the sense that their renovation has been so complete that the time for their next inspection starts afresh.

-10-

However, the parties immediately encountered many problems with the Aircraft, which defendant was contractually obligated to fix in order to deliver the plane in the agreed-upon manner and condition. Although the problems were significant, plaintiff, instead of terminating the Agreement, took several steps to assist seller in fulfilling its contractual obligations.

First, plaintiff learned that the engines were so severely corroded they would need to be "totally overhauled" and taken back "essentially to zero-time". 4/8/2022 Hearing Tr. at 55:12-56:11. Dr. Gillis offered to assist the seller in curing the engine problem. Id. at 56:12-20; 57:3-11. Leveraging his pre-existing relationship with the original engine equipment manufacturers (Honeywell and Standard Arrow), Dr. Gillis was able to coordinate the overhaul of the Aircraft's engines, including negotiating for the use of alternative parts that were not readily available, so that Closing on the Aircraft would occur on time. Id. at 57:6-58:13.

Next, Dr. Gillis also learned that the Aircraft had significantly deferred maintenance, and it was difficult to find the parts required for such maintenance and to get them into China so that the work could be performed. Id. at 59:15-24. Dr. Gillis again relied on a pre-existing relationship with the aircraft manufacturer Bombardier to arrange for the required aircraft inspections. After those initial inspections were completed, Dr. Gillis discovered that the Aircraft's auxiliary

-11-

power unit ("APU") also needed to be inspected by way of a borescope analysis. Id. at 59:13-60:11, 69:19-23. That analysis, paid for by Dr. Gillis (id. 60:10-11), determined that the APU needed to be repaired, and until it could be, the Aircraft would not be airworthy. Id. at 60:16-18. Still, Dr. Gillis agreed to accept the auxiliary power unit in "as is" condition and, through Honeywell, arranged for a temporary loaner APU to be placed on the Aircraft for the flight to the place of delivery (Singapore) so that Closing on the Aircraft would occur on time. Id. at 59:25-62:16. The parties amended their Agreement to represent plaintiff's accepting of the APU in "as is" condition. See JX 5 § 1.1.1.

During the hearings, both Dr. Gillis and Mr. Zuskin discussed whether there were any Challenger 300s with these characteristics currently on the market. Of the six Challenger 300s arguably available for purchase as of April 11, 2022, there were no other 2012 Challenger 300s available with 1,300 or less flight hours. 4/12/2022 Hearing Tr. at 263:11-17; PX 7 (JETNET listings). There were no Challenger 300s with zero-time engines, or about to have zero-time APU. 4/11/2022 Hearing Tr. at 121:10-13; PX 7. None of the available models had recently accomplished the 96-month inspection. 4/12/2022 Hearing Tr. at 203:22-25. None of the available models are models from 2012 or later, which means none of them have a folding doorway between the galley of the airplane and the cabin of the airplane, which

-12-

provides more patient privacy. 4/12/2022 Hearing Tr. at 203:19-21; PX 7. A 2014 Challenger 300 would be significantly more expensive and would be due for its eight-year inspection in 2022, which would take the Aircraft out of service for at least a month and a half. 4/12/2022 Hearing Tr. at 178:9-22.

The Challenger 300 is also incomparable to the other aircraft defendants cite as adequate substitutes, such as the Gulfstream 200, 280, Falcon 2000, Embraer Praetor 500, Citation Sovereign, Citation Latitude, Citation Longitude.[3] For one, the FAA has only approved medical systems on two types of super mid-sized or mid-sized aircraft - the Challenger 300 and the Citation Sovereign. 4/12/2022 Hearing Tr. at 183:2-6. None of the other aircraft cited, other than the Citation Sovereign, have an FAA-approved kit to be retrofitted for exclusive medical purposes (a fact Mr. Zuskin appeared unaware of when providing his testimony on comparable aircraft, see id. at 275:9-16), meaning that substantial engineering work, research and development would need to be done to convert those aircraft for FAA approval for medical use. 4/11/2022 Hearing Tr. at 135:1-14.

---

[3] At the hearing, Mr. Zuskin explained how he selected the other allegedly comparable aircraft, stating "They are all very different. But, but, but they all fit into the same general category of midsized jets. And when I was looking at this, I just simply just did a mind dump, and every midsized jet that is sort of the same size, has the same range, has roughly the same speeds, I just -- I just threw it out there. . . . So one could argue, yes, that the Challenger 300 is the fastest airplane in the sky. It's probably not. I know it's not. But nevertheless I just threw all these airplanes out because they are in the same general category in terms of size and in terms of their range and payload capabilities." 4/12/22 Hearing Tr. at 290:20-291:11. That cavalier, undiscriminating process does not rebut plaintiff's fact-based, plane by plane evidence that this Challenger 300 is now, or soon will be, one-of-a-kind.

And the Challenger 300 is also different from the Citation Sovereign, a pure mid-sized (in contrast to super mid-sized) jet, which has a smaller cabin than the Challenger 300. 4/12/22 Hearing Tr. at 275:19-276:12. The Challenger 300 also has a longer range than the Citation Sovereign. Id. at 276:13-15.

Mr. Zuskin originally stated that several other super mid-sized or mid-sized aircraft (including those listed above) can carry the same passenger load and travel the same distance as the Challenger 300 (see Zuskin Supplemental Decl. at ¶ 12, Dkt. No. 49). At the hearing, Mr. Zuskin modified his statement, explaining the other aircraft will carry the same passenger load "roughly" the same distance as the Challenger 300. 4/12/2022 Hearing Tr. at 289:20-292:8.

Ultimately, the testimony showed that this Challenger 300 has more ideal operating parameters than the other aircraft cited. None of those aircraft has an equivalent range to the Challenger 300, nor the speed to enable plaintiff to travel coast to coast and meet the medical requirements needed for patient care. 4/11/2022 Hearing Tr. at 134:1-5, 135:15-20.

Plaintiff also showed that even the Learjet, which Dr. Gillis previously used to treat patients and for organ transportation, was less suitable for such use than the Challenger 300. The Learjet has a shorter range, is not as fast, and has lower performance parameters than the Challenger 300; the owner cannot have maximum passengers, full fuel tanks, and

reach the maximum range. 4/8/2022 Hearing Tr. at 43:3-7-44:2-7; 4/12/2022 Hearing Tr. at 176:24-1771. Learjets are also much smaller and have low ceilings, meaning medical professionals of at least average height or taller are not able to stand upright in a Learjet air ambulance, making it very difficult to provide acute medical care (such as cardiopulmonary resuscitation, or "CPR"). 4/8/2022 Hearing Tr. at 43:2-11; 4/12/2022 Hearing Tr. at 177:10-19. Further, Learjets have been out of production for at least 30 years, meaning any Learjet on the market likely has a very high flight time and will have a higher need for maintenance than a newer aircraft. 4/12/2022 Hearing Tr. at 176:14-23.

Finally, even if the other Aircraft were technical substitutes for the Challenger 300, Dr. Gillis, a central person to Jet Experts' operations, has the greatest familiarity with the Challenger 300, the most experience dealing with the Challenger 300 manufacturer, parts-facility- and service-centers, and long-term relationships with Bombardier personnel, making it more important that he acquire a Challenger 300 than any other aircraft to be able to carry out his organ transportation services effectively. 4/8/2022 Hearing Tr. at 46:1-47:8; 59:1-62:16.

Plaintiff has no adequate remedy at law because the Aircraft is a unique chattel that uniquely satisfies plaintiff's particular need for a medical aircraft. See, e.g., Hoffman v.

-15-

Sprinchorn, 1997 WL 128352 (W.D.N.Y. 1997) (granting specific performance of contract to purchase 1933 Duesenberg J. Murphy Convertible Coupe for agreed price of $375,000, even though 15 others were on the market); Sedmak v Charlie's Chevrolet, Inc., 622 S.W.2d 694, 700 (Mo. App. Ct. 1981) (ordering specific performance for sale of Corvette which was one of 6,000 manufactured "Pace Cars" since plaintiff could not purchase an automobile of that kind with the same mileage, condition, ownership and appearance as the automobile involved in the sale, except, if at all, with considerable expense, trouble, loss, great delay and inconvenience).

Dr. Gillis took a dilapidated, production-line aircraft and, in a laborious and expensive process, restored it, changed its engines, its APU, its internal arrangements, and created a specially designed and fitted individual aircraft for the particular service his medical practice needs. No other aircraft currently available will do as well.

**Public Interest**

The public has an interest in the enforcement of contractual obligations and prevention of fraud. Rex Med. L.P. v. Angiotech Pharms. (US), Inc., 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010)("The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense."). That interest is served by requiring defendants to perform their

obligations under this contract. There is no countervailing public policy favoring defendants who have not acted in good faith, and whose behavior borders, if it does not cross, the line of fraud.

**CONSOLIDATION PURSUANT TO FED. R. CIV. P. 65(A)(2)**

Rule 65(a)(2) of the Federal Rules of Civil Procedure provides that "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Under the rule, the Court has "broad discretion" to order consolidation. Abraham Zion Corp. v. Lebow, 761 F.2d 93, 101 (2d Cir.1985).

All material issues have been disposed of and none reserved for later treatment.

In view of the benefits of a prompt resolution of this dispute, it is ordered that the preliminary and final stages be consolidated and adjudicated in this Order and Judgment.

The post-hearing submissions of the parties have been considered in the preparation of this Opinion. The applications in plaintiff's correspondence (Dkt. No. 90) are denied, and defendants' counterclaim is dismissed as failing to state a claim, being founded on its misevaluation of the APA section discussed above.

The relief granted in the Court's April 14, 2022 Temporary Restraining Order is no longer as urgent as it was then, the

Court having entered final judgment, and plaintiff's application for a permanent anti-suit injunction is denied, without prejudice to renewal if justification arises.

## CONCLUSION

For the foregoing reasons, the Court holds that plaintiff Jet Experts has established its claims against defendants; therefore,

The Clerk will enter JUDGMENT in favor of plaintiff Jet Experts, LLC and against defendants Asian Pacific Aviation Limited and TVPX Aircraft Solutions, Inc., in its capacity as Owner Trustee (collectively, "defendants"), on plaintiff's claim for Specific Performance, directing defendants to forthwith transfer to plaintiff, in accordance with the procedures set forth in the Aircraft Purchase Agreement, the legal title, possession and control of the 2012 Bombardier Challenger 300 bearing manufacturer's serial number 20382 and U.S. Registration Number N528YT and two (2) Honeywell model AS907-1-1A aircraft engines bearing manufacturer's serial numbers P-118908 and P-118909 (the "Aircraft") within thirty (30) days of this Order, unless otherwise agreed by the parties, for plaintiff's possession, use and operation in its business and medical practice.

IT IS FURTHER ORDERED, that plaintiff shall hold the aircraft as Trustee for the defendants, in case the Court of Appeals should overturn this ruling. During the time from its

receipt of possession and ownership of the Aircraft to the delivery of the Court of Appeal's decision on any timely appeal by defendants, plaintiff shall not operate outside of or permit the Aircraft to leave the limits of the Continental United States of America, nor shall it make any substantial alteration in the Aircraft, or its equipment without the prior consent of defendants or this Court, so that if so directed by the Court of Appeals, it can be returned to the defendants in the condition in which it was delivered by them to plaintiff.

IT IS FURTHER ORDERED THAT, this Court retains jurisdiction to consider Plaintiff's supplemental application for the award of reasonable attorneys' fees and costs incurred, as expressly provided for in Section 7.15 of the Purchase Agreement. Plaintiff shall submit evidence of its costs and attorneys' fees by two weeks after expiration of the time to appeal this Order and Judgment if no appeal is taken; if an appeal is taken, the prevailing party shall do so by two weeks after the Court of Appeals issues its mandate.

So Ordered.

Dated:   New York, New York
         May 4, 2022

*Louis L. Stanton*
Louis L. Stanton
U.S.D.J.